GEORGE WEATHERBY SICKLER, III,   )
                                 )
          Plaintiff/Appellant,   )          Appeal No.
                                 )          01-A-01-9710-CV-00571
v.                               )
                                 )          Williamson Circuit
CLETUS JOY SICKLER,              )          No. 96014
                                 )
          Defendant/Appellee.    )
                                 )

FILED

May 5, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE


APPEAL FROM THE CIRCUIT COURT FOR
WILLIAMSON COUNTY
AT FRANKLIN, TENNESSEE


THE HONORABLE HENRY D. BELL, JUDGE


PATRICIA A. McDADE
227 Bridge Street
Franklin, Tennessee  37064
          ATTORNEY FOR PLAINTIFF/APPELLANT


REBECCA E. BYRD
306 Public Square
Franklin, Tennessee  37064
          ATTORNEY FOR DEFENDANT/APPELLEE


AFFIRMED AS MODIFIED,
AND REMANDED


WILLIAM B. CAIN, JUDGE

# OPINION

This appeal involves the division of property and the award of alimony as between parties who were married for many years. On appeal, the appellant is challenging the trial court's characterization of certain property as marital property, the trial court's division of the marital estate, and the trial court's failure to award both periodic alimony as well as attorney fees and costs to the wife. The decision of the trial court is affirmed with regard to certain matters and reversed with regard to others.

## I. FACTS

George and Cletus Sickler were married for 27 years when their marriage ended by final decree entered October 8, 1996. At the time of the trial, Mr. Sickler ("the Husband") was 50 years old and Ms. Sickler ("the Wife") was 49 years old. The parties are the parents of one adult child who was born in the first year of their marriage.

The Husband testified that he has a degree in journalism. His professional experience has been primarily in the field of employee and marketing communications with some newspaper reporting experience. His most recent employment was with Northern Telecom where he worked for 13 years before being laid off in October 1995. Though the Husband began at Northern Telecom at an annual salary of $42,000, he made over $70,000 for each of the last three years in this job.

The Husband testified that he sought another job within Northern Telecom prior to his termination. Finding no opportunity at Northern Telecom, the Husband and some partners began a business, Stealth Laboratories, which manufactured and marketed security products. The Husband was working almost full-time on this business out of an office in the home that he shared with the Wife. He testified that he saw Stealth as the best career opportunity for someone that was his age.

The Husband claimed that he invested approximately $32,000 of his separate funds into Stealth. At the time of trial, Stealth had not become successful enough for the Husband to draw any income from it. By April of 1996, the Husband had begun to actively search for other employment again. He testified that, at the time of the trial, he was living with his father in Dallas and supporting himself through loans from his father.

At trial, the Wife testified that she was within one year of obtaining a bachelor's degree. She had stopped college shortly after marriage in order to stay home with the parties' child. She had been employed in journalism on a part-time basis for many years. She claims that this field has changed such that employers now prefer to hire part-time and temporary workers and pay at rates that are inadequate for her to support herself. The Husband testified that throughout the marriage, the Wife expressed a desire to have a professional career "whether it was working in the home, book writing, or doing news gathering or PR work." However, though he felt she was very capable, he said she always had a difficult time implementing her plans.

It is undisputed that the Husband received some $75,000 during the course of the marriage from gifts and inheritances. The Husband concedes that $50,000 of this money was used for marital purposes; however, he claims that the rest of the money remained his separate property. Beginning in 1977, the Husband opened various separate bank accounts in his name alone. He claims that he deposited all such funds into these separate accounts and that no marital funds were put into them. On the other hand, the Wife maintains that she was active in helping to choose the items upon which the funds were expended and that the items were subsequently used for family entertainment purposes.

By court memo entered March 11, 1997 and court order entered June 3, 1997, the court divided the parties' property and its debts. The court found that all assets claimed by either party to be marital property were marital assets subject to equitable division. The court's memo acknowledged the Husband's contention that he began treating $25,000 of his $75,000 inheritance as separate property by purchasing musical instruments for his exclusive hobby. However,

the court found that "the evidence preponderates against [the H]usband's contention that the funds in question had become, by agreement of the parties, his separate property and his contention that collecting musical instruments had become his personal and separate hobby." With regard to Stealth Laboratories, the court provided that the loss of marital funds invested to date would be divided half to each party.

In addition, the court found that this was an appropriate case for periodic alimony to be awarded to the Wife. However, since the Husband was unemployed with no substantial investment income, the court reserved ruling on this issue of alimony pending a substantial change in the Husband's financial circumstances. The Court of Appeals dismissed the appeal for lack of a final judgment because the order reserved judgment on the issue of alimony. The trial court responded by issuing an Order Nunc Pro Tunc on April 3, 1998 which asserted that the court had adjudicated all matters necessary for the divorce of the parties and the division of the marital estate, that this case was an appropriate case for periodic alimony to the Wife and that the Husband was unable to make periodic alimony because he was unemployed through no fault of his own. The court reserved jurisdiction to make an appropriate award of alimony to the Wife if and when there is a material and substantial change of circumstances.

## II. CLASSIFICATION OF PROPERTY

The majority of this appeal is devoted to the trial court's alleged wrongful classification of all of the parties' property as marital property. Trial court decisions regarding classification and division of property in divorce actions are reviewed de novo, with a presumption of correctness unless the evidence preponderates against the same. Tenn. R. App. P. 13(d); *Farrar v. Farrar*, 553 S.W.2d 741, 743 (Tenn.1977). "Since [Tennessee Code Annotated section] 36-4-121(a) (1991) vests trial courts with wide discretion with regard to classifying and dividing property, *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn.1983), these decisions are entitled to great weight on appeal." *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. App. 1996). We therefore review the lower court's decision with a proper degree of deference.

As Tennessee statutes provide only for the division of marital property, the court must first correctly classify the property of the parties as either marital or separate before proceeding to its equitable division. *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. App. 1988). With regard to this distinction, the code provides as follows:

> (1)    (A) "Marital property" means all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . .
>
> (B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation and the value of vested pension, retirement or other fringe benefit rights accrued during the period of the marriage.
>
> (C) As used in this subsection, "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine. . . .
>
> (2) "Separate property" means:
>
> (A) All real and personal property owned by a spouse before marriage;
>
> (B) Property acquired in exchange for property acquired before the marriage;
>
> (C) Income from and appreciation of property owned by a spouse before marriage except when characterized as marital property under subdivision (b)(1); and
>
> (D) Property acquired by a spouse at any time by gift, bequest, devise or descent.

Tenn. Code Ann. § 36-4-121 (1996).

After determining that property is separate property pursuant to the statute, the court must decide whether that property became part of the marital estate because the parties treated it in such a manner. This court has recognized such a possibility by adopting the doctrines of transmutation and commingling. Transmutation is described as follows:

> [Transmutation] occurs when separate property is treated in

such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

*Batson*, 769 S.W.2d at 858 (citing 2 H. Clark, *The Law of Domestic Relations in the United States* § 16.2, at 185 (1987)); *see also Barnhill v. Barnhill*, 826 S.W.2d 443, 452 (Tenn. App. 1991). The second doctrine "is commingling, according to which separate property becomes marital property if inextricably mingled with marital property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur." *Pope v. Pope*, 1988 WL 74615 at *3 (Tenn. App. 1988) (quoting H. Clark, *The Law of Domestic Relations* 16.2 (2d ed.1987)).

In contending that the trial court misclassified separate property as marital property, the Husband presented nineteen disputed items, seventeen of which are antiques. The majority of these antiques are musical instruments though a clock, a slot machine, a coin operated picture viewer and a 1927 Chevrolet Touring Car are included among them. The Husband has fastidiously presented evidence that he maintained certain inherited and donated funds separate from the marital funds and that these traceable separate funds were used to purchase all of these antique items. He asserts that he "enjoyed rebuilding antique mechanical objects. There is no evidence [the] Wife shared this interest, and no evidence of any other use of the property."

As stated, the trial court held that "the evidence preponderates against [the H]usband's contention that the funds in question had become, by agreement of the parties, his separate property and his contention that collecting musical instruments had become his personal and separate hobby." We interpret the trial

court's decision to mean that, regardless of the separate source of the funds, they were transmuted by the parties' treatment of them. To reiterate, "[transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property." *Batson*, 769 S.W.2d at 858. Indeed, in *Batson*, the court found that though the husband used separate funds to purchase a house, evidence supported that this house was marital property partly because the record failed to indicate that the house was ever treated as separate property. *Id.* at 858. In the instant case, we find that the evidence supports the trial court's conclusion that the antique items were treated as if they were marital property.

The Wife testified that from the beginning and throughout the course of their marriage, she and the Husband had both enjoyed antiques. Together, they traveled to flea markets, antique stores and auctions. They even organized a company for the purpose of buying antiques and selling them wholesale to antique dealers. She testified that both she and the Husband saw these antique items as investments which could be sold later should they need the money. They bought a few items with the specific intent to sell them. They would discuss "ball park figures" before going to purchase items. The Wife testified that the Husband never told her that these items were coming from his funds or that they were his purchases.

With regard to the music devices in particular, the Wife stated that she and the Husband had both always been interested in music and together became interested in acquiring "musical things." While her husband alone restored the instruments, she participated in searching publications and mailers for deals and in traveling to auctions and flea markets to find and purchase these items. When asked what she did while her husband worked on the musical equipment, the Wife testified that she "was running the household . . . cleaning house, doing laundry, cooking meals, taking care of our son, doing whatever else needed to be done at the house." The Wife especially was interested in the musical instruments for enjoyment purposes: the parties displayed the items throughout their house and they played certain instruments for musical entertainment.

In addition to the musical instruments and other antiques, the Husband claims that the First American Stock and the Delaware Fund were incorrectly classified by the lower court as marital property. With regard to the former, the Husband claims that he used separate funds from an Employee Credit Association account to purchase Heritage Federal Bank Stock in the amount of $1506.50. This bank merged with First American Bank resulting in the Husband receiving 211 shares of First American Bank Stock. As the Wife points out, the Husband testified that the funds in the Employee Credit Association account were primarily travel reimbursement checks from his business at Northern Telecom. It is clear that whatever the Husband earns during the marriage is marital property. *Wade v. Wade*, 897 S.W.2d 702, 716 (Tenn. App. 1994). Thus, the travel reimbursement monies which were the primary substance of the Employee Credit Association account were marital property. Any other funds that were put into this account were commingled with this marital property and thus became marital property. We therefore find that the evidence does not preponderate against the trial court's finding that the First American Stock was marital property.

Turning to the Delaware Fund, the Husband testified that he received the initial shares of this fund from his family. Its initial value was $2,256.00. The parties made no contributions of any kind to the fund throughout the marriage. The number of the shares had reached 2,078.46 by December 1996 at which time the parties agreed that each would be assigned 260 shares. The Husband main-tains that the remaining shares which total 1,558.46 are his separate property. The Wife claims that the Delaware Fund was transmuted because it was listed as a family asset on an application for a residential loan to refinance the parties' house and because it was listed as dividend income on the parties' joint income tax returns. It is undisputed that the funds initially used to open the Delaware Fund were from the Husband's family and that neither party did much, if anything, to increase this account during the marriage. We do not find that the corpus of the Delaware Fund was transmuted simply because the fund was listed as an asset on an application to refinance the marital home or because the capital gains from the fund were treated as joint income for tax purposes. Accordingly, the Delaware Fund remained the separate property of the

Husband.

Also, the Husband challenges the court's finding with respect to Stealth Laboratories, a limited liability company started by the Husband and three partners. Without making any disposition of the interest in Stealth, the court divided the loss of the funds invested in Stealth half to each party. The Husband claims that the court erred. He testified that he joined the Stealth group on a part-time basis in September of 1994 which was ten months prior to leaving his full-time job at Northern Telecom in October of 1995. He stated that he discussed Stealth with the Wife who was initially very supportive. At the time of trial, Stealth had failed to provide any income but the Husband still saw potential in this business venture and continued to work to make it successful. The Husband testified that he made an initial investment of $5000 into Stealth out of personal funds and that he had put at least $32,000 more into Stealth since that time. He admitted that $5000 of the money put into Stealth came from marital funds but claims that the use of this money, without more, did not transform the property into marital property.

It is undisputed that Stealth was the Husband's sole employment after he left Northern Telecom and for a period of time while he was still married to the Wife. Along with the aforementioned funds, he put all of his energy and time for work into this endeavor. As stated above, whatever the Husband earns during the marriage is marital property. *Wade*, 897 S.W.2d at 716. Therefore, any gain or loss from this business venture up until the time of trial was marital property. To the extent that the Husband put separate funds into Stealth, these funds were commingled. Therefore, the court did not err in finding that the investment in Stealth was marital property at the time of the divorce. However, we do not find any basis for the trial court's allocation of one-half the "loss of marital funds invested to date" to each party. It is undisputed that, at the time of trial, Stealth had provided no income. Thus, the money invested is gone. It is not, in the words of the code, "owned by either or both spouses as of the date of the filing of the complaint for divorce." Tenn. Code Ann. § 36-4-121(b)(1)(A)(1996).

As stated, the trial court did not award Stealth to either party. We find

that to force these parties to maintain a business relationship through Stealth seems less than ideal. Therefore, it is our conclusion that an equitable distribution of this estate requires that Stealth be awarded to the Husband. The Husband is clearly the party with the experience and expertise to conduct this business. *See Loyd v. Loyd*, 860 S.W.2d 409, 412 (Tenn. App. 1993). We remand this case for the trial court to value and divide the interest in Stealth at the time of divorce.

There are nearly two hundred separate documentary exhibits in this case, almost all being directed to a meticulous tracing of funds through various bank accounts in an effort by the appellant to establish that numerous items of personal property are his separate property, rather than marital property. In the final analysis, transmutation is a matter of intention " . . . when separate property is treated in such a way as to give evidence of an intention that it become marital property." *Batson v. Batson*, 769 S.W.2d 849, 858 (Tenn. App. 1988). This presents a credibility determination to be made by the trial court.

On the one hand the Husband testified:

THE COURT:

Q. I have one question for this witness and that is: As I understand it, since 1982, you transferred funds from Third National Bank checking account with your and her name both on it? You were the only one that wrote the checks on it. Did you transfer that to a Credit Association account, right?

A. I established my employee Credit Association account, Your Honor, in 1989.

Q. Was that the year of the transfer?

A. Yes, sir.

Q. Is that the year she moved down here?

A. I think --

MS. MCDADE: Let me try to explain it.

BY THE COURT:

Q. You set up a separate savings account. What did you do?

A. All right, sir. When I moved down from Pennsylvania, I established a Third national Bank account, which I used for everything at Northern Telecom. When my wife came down two months later or thereabouts, I established another --

Q. Third National?

A. -- checking account with Third National Bank of Nashville. And that became the marital account into which all my paychecks went. I retained the original Third National Bank account as my business account to process all my travel reimbursements and motels, as well as for any independent funds.

Q. And in that was also your separate funds?

A. Yes, sir.

Q. All right. At some time, you did make a transfer from that account --

A. In 1989.

Q. I guess what I really want to ask you is: Did you discuss with your wife the fact that you had set up a separate account and that your ancestral funds were staying there and not going to the family?

A. Yes, sir.

Q. What was the discussion you had?

A. The discussion was, I wanted to maintain the individual integrity of my own money, for one thing. Secondly, I established the Employee Credit Association checking account, I believe at the time when I transferred from the Northern Telecom facilities at Highland Ridge by the airport to the Metro Center location.

Q. You told your wife what you've told us?

A. Yes, sir.

Q. And was she agreeable?

A. It happened, Your Honor.


In direct contravention of the foregoing testimony by the Husband the trial court had before it the testimony of the Wife, stating in part:

Q. Okay. And the last page, October the 10th of '79?

A. I believe that's on this other page. Yes. And it says Wallin Trust and it's in my handwriting.

Q. And, again, during any of these deposits, did he make any effort to segregate these funds?

A. No. The only thing he would do is, if I didn't get them deposited the day they came in or as soon after, he would be, well, why didn't you get that taken care of. I told you to do that. But other than that, there was nothing else said. He works near the bank. He said I have more time since I stayed at home. So I was the one who took care of the banking when I could and did all of that.

Q. Did he ever tell you, please, make sure you put this in my separate account; this is my money?

A. Never.

Q. Or words to that effect?

A. Never. It was never to the fact that it was separate money. It was never discussed. He would say things like

-11-

this is really helping us out, you know; we couldn't do some of the things we're doing without this money from my family. But it was always we and ours.

* * *

Q.    Now, you've heard Mr. Sickler's testimony about his separate savings account and transfers he would make from his separate savings account into the marital account to cover checks he wrote for paying for musical equipment. Did he ever make transfers from that account for other reasons to cover the marital account expenses or whatever?

A.    If there was something that we wanted to buy, and we needed the money, yes. Some of that money -- I believe some of the money he had put in that account that we would wound up using to put the addition -- I believe he testified to that, to put the addition on our house. So it was used for whatever. And the musical instruments were used for the family. I mean, they weren't just used for him. We all enjoyed them. We all played them.

Q.    When did you first learn that he considered those funds to be his separate funds?

A.    When he told me that he wanted a divorce.

Q.    So before that time, he hadn't told you, these are my funds; they're earmarked especially for me?

A.    No.

Faced with this massive record and this directly conflicting testimony, the trial judge held:

During the first fourteen years of the marriage, all of the property acquired by either party from any source was commingled and used for family purposes. Part of this property was gifts of money to and by inheritances by husband in the combined amount of $75,000. Husband concedes that $50,000 thereof was devoted to family purposes, including the acquisition of a residence titled to the parties jointly. Husband contends that after the parties moved to Tennessee, he began to treat the remaining $25,000 as his separate property and that musical instruments bought with part of these funds were his exclusive hobby. Husband cites no authority for the proposition that assets which have become marital property by the conduct of the parties can be, in effect, converted into separate assets by the unilateral intention and/or action of a spouse. The court finds and concludes that the evidence preponderates against Husband's contention that the funds in question had become, by agreement of the parties, his separate property and his contention that collecting musical instruments had become his personal and separate hobby.

The burden rests upon the appellant under Rule 13(d) of the Rules of Appellate Procedure to establish that the evidence in the record preponderates against these findings of fact by the trial judge. With the exception of the Delaware Fund, the Husband fails to carry his burden despite massive efforts on his part.

> Where, as in this case, the determination of the issues of fact depends largely upon the credibility of the two adversary parties and the case is tried upon oral testimony, the findings of the trial judge are entitled to great weight since he saw the witnesses face to face and heard them testify. This is true because he was in a much better position than we are to judge the value of their evidence.

*Crouch v. Crouch*, 385 S.W.2d 288, 291 (Tenn. App. 1964).

Even apart from the court's classification of the property, the Husband submits that the court's division of the marital property was inequitable. Pursuant to statute, the trial court had the duty to reach an equitable division of the marital property, taking into consideration the factors established in section 36-4-121(c) of the Tennessee Code. The Husband's complaint is based upon the court's alleged failure to consider several particular circumstances in dividing the property. One of these was that the Wife withdrew $29,000 from the parties' joint account at the inception of the proceedings. Another was that the court failed to take into account the Husband's obligation pursuant to a pendente lite order to reimburse the Wife the sum of $3,748.77 which represented one half of the mortgage payments made by the Wife during the pendency of the divorce proceeding.

As for the Wife's withdrawal of $29,000 from the parties' joint account, her testimony was that she expended this money on marital debt including the parties' mortgage and credit card debt. As for any other inequality of the property division, this court has held that "[a] trial court's division of property need not be equal to be equitable. *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. App. 1988). "As a general matter, courts will evaluate the fairness of a property division by its final results." *Bookout v. Bookout*, 954 S.W.2d 730, 732 (Tenn.

App. 1997) (citing *Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. App. 1990)). In its memorandum opinion, the court noted that it "awarded the wife the larger share of marital assets because of her lesser earning capacity and her need for rehabilitation by obtaining a college degree." We do not find that the evidence preponderates against this finding.

## III. ALIMONY

Before we address the issue of alimony, we turn to the Wife's assertion that the trial court erred in establishing both her and the Husband's earning capacities. As stated the court found the Husband's earning capacity was $60,000 per year. The Wife asserts that the Husband's earning history is $70,000 per year. The Husband did testify that his salary was around $70,000 for the three years prior to losing his job at Northern Telecom where he had begun work some thirteen years earlier at a salary of $42,000. Though he said that he expected to find a job with a salary comparable to the one he was making before termination, there was no direct proof that a job with such a salary would be available to him. Indeed the proof was that, at the time of trial, the Husband had been out of work for over a year. He was over fifty years old. He testified that for someone who had been displaced at his age and with his skills, it typically takes at least two years to find a corporate job and that would be at two thirds to half of his former salary. At the time of the trial, the Husband was pouring his time and energy into a start-up company for which there was no established earning capacity. In light of these circumstances, we do not think that the court abused its discretion in stating that the Husband's earning capacity was $60,000.

The court found the Wife's earning capacity was about $25,000 per year with a college degree. She testified that she had three years toward a Bachelor of Arts degree. She testified that at the time of the trial she was earning $240 per month taking care of her grandchildren. Her work history included sewing and free lance writing for several newspapers. From 1984 to 1994, the Wife worked between 20-35 hours per week doing contract work for the Tennessean at $8.50 per hour plus mileage. The Wife asserts in her brief that her income history is approximately $12,000 to $13,000 per year and that her earning capacity should be modified to $12,000. Again, we find no error on the part of the trial court.

The Wife presents a figure that is approximately half of what the trial court found. However, the Wife's figure is based upon an income history during which she worked approximately half of a full-time load without a college degree. We therefore find that the court did not abuse its discretion in finding that the Wife is capable of earning $25,000 per year.

Regarding the issue of alimony, the Wife argued on appeal that the trial court erred by not establishing an immediate award of alimony. The court found that based upon the statutory considerations, the 27-year duration of the marriage, and the Wife's lesser earning capacity, this was an appropriate case for periodic alimony. However, the court's opinion was that with the Husband "presently unemployed and with no substantial investment income, . . . it is not appropriate to make an alimony decree under the present circumstances of the parties." The court thus reserved the alimony issue pending a substantial change in the Husband's financial circumstances.

As with the division of marital property, the trial court is vested with great latitude in making a determination involving alimony. *Bull v. Bull*, 729 S.W.2d 673, 675 (Tenn. App. 1987). "The decision is factually driven and requires a balancing of the factors listed in [Tennessee Code Annotated section] 36-5-101(d)." *Lloyd v. Lloyd*, 860 S.W.2d 409, 412 (Tenn. App. 1993). Of these factors, "[t]he need of the spouse to whom alimony is awarded and the ability of the other to pay are two dominant factors to consider when deciding a proper award of alimony." *Young v. Young*, 971 S.W.2d 386, 391(Tenn. App. 1997). Among the statutory factors are "(A) [t]he relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources [and] (B) [t]he relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level [and] (C) the duration of the marriage; . . . [and] (G) [t]he separate assets of each party, both real and personal, tangible and intangible." Tenn. Code Ann. § 36-5-101(d)(1) ( A), (B), (C) & (G) (Supp. 1998).

By its award of periodic alimony, the trial court made the determination that as between these parties "there is such relative economic disadvantage and rehabilitation is not feasible." Tenn. Code Ann. § 36-5-101 (Supp. 1998). The proof was that the Wife was approximately 50 years old, that she did not have a college degree and that she did not have significant work experience. The Husband had a college decree and had enjoyed a successful career in his field until the time that he was laid off from his job. The court found that the Husband's earning capacity was $60,000 per year whereas the Wife's was $25,000 per year. These circumstances indicate that an award of periodic alimony was appropriate and accordingly we affirm the trial court's decision that the Wife needs periodic alimony.

However, despite its determination that this was an appropriate case for periodic alimony, the trial court did not make such an award. Rather it reserved ruling on the issue pending a change in the Husband's financial circumstances. In so doing, the court stated that "with [the] Husband presently unemployed and with no substantial investment income, it is not appropriate to make an alimony decree under the present circumstances of the parties." While it is true that the Husband was presently unemployed and living with his father at the time of trial, his own Rule 15 statement indicated that he received $150,533 in marital property. In light of the finding that periodic alimony is appropriate, we find that the Wife should have been given an in solido award out of the Husband's marital estate during the period that the Husband was unemployed. Thus, for the time period between June 3, 1997 when the trial court's order came down and the present time, we award an in solido amount to the Wife in the amount at $10,000 which represents $100 per week for this time period. In addition, we remand this case to the trial court to set an amount of periodic alimony based upon the Husband's earnings under his present circumstances.

IV.  ATTORNEY FEES AND COSTS

In the Wife's next issue, she asserts that the trial court erred in not granting her an award for attorney fees and discretionary costs. The court ordered that the Husband and Wife should each be responsible for the payment of their own attorney fees and discretionary costs. An award of such fees is

within the sound discretion of the trial court and will not be disturbed unless the evidence preponderates against it. *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. App. 1997). We do not find that the evidence preponderates against the trial court's decision.

On appeal, the Wife claims that she has no liquid assets with which to pay these fees and costs. However, the evidence shows that neither party has sufficient liquid assets and that both parties will have to deplete their assets to pay their own attorney fees. As stated above, the Husband is unemployed, living with his father, and borrowing money to pay his own expenses. He is no better position to pay the attorney fees than the Wife. Certainly "where the wife demonstrates that she is financially unable to afford counsel, and where the husband has the ability to pay, the court may properly order the husband to pay the wife's attorney fees." *Kincaid v. Kincaid*, 912 S.W.2d 140, 144 (Tenn. App. 1995); *see also* Tenn. Code Ann. § 36-5-101(I) (1991). However, this is not the case here. We affirm the court's decision to require each party to pay his own attorney fees.

## V. CONCLUSION

In conclusion, we find the evidence supports the trial court's finding that all assets other than the Delaware Fund and Stealth Laboratories were marital assets subject to equitable division by the court. Furthermore, the court's division of the marital property was equitable. We find that Stealth Laboratories as well as the Delaware Fund should be awarded solely to the Husband. With regard to Stealth, we remand this case to the trial court such that the Husband's interest in Stealth at the time of the divorce can be valued and divided. With respect to periodic alimony, we uphold the court's decision that the evidence supports the need for a periodic alimony award at this time. We remand for the trial court to set an amount which is appropriate under the Husband's present circumstances. We also award $10,000 as an in solido amount to cover the period of time from the trial to the present. We affirm the trial court's decision disallowing attorney fees and costs to the Wife. In light of this holding, we deny the Wife's request for attorney fees and costs on appeal. Tax the costs of this appeal to both parties equally.

_____
WILLIAM B. CAIN, JUDGE

CONCUR:


_____
BEN H. CANTRELL, P.J., M.S.


_____
WILLIAM C. KOCH, JR., JUDGE